IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 1, 2012 Session

## STATE OF TENNESSEE v. JAMES SNIPES

**Appeal from the Criminal Court for Shelby County
No. 08-07885    Carolyn Wade Blackett, Judge**

---

**No. W2011-02161-CCA-R3-CD  - Filed April 12, 2013**

---

The Defendant, James Snipes, was convicted by a Shelby County Criminal Court jury of felony murder, second degree murder, a Class A felony, aggravated criminal trespass of a habitation, a class A misdemeanor, and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-202, 39-13-210, 39-14-406, 39-17-1324 (2010). The trial court sentenced the Defendant to life imprisonment for felony murder, eleven months and twenty-nine days for aggravated criminal trespass, and six years for employing a firearm during the commission of a dangerous felony. The court merged the second degree murder conviction with the felony murder conviction. On appeal, the Defendant contends that mutually exclusive verdicts require dismissal of the felony murder conviction. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, James Snipes.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich; District Attorney General; and Douglas Gregory Gilbert and Lora Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to a home invasion resulting in the death of Charles Beegle, Jr. At the trial, firearms investigation and examination expert Donald Carman testified that in September 2008, he was a forensic scientist with the Tennessee Bureau of Investigation (TBI). He said that on September 12, 2008, he received a .25 caliber semi-automatic pistol

with the serial number 202684 for examination. He said he also received a .38 caliber Colt revolver with serial number 33093R and a .380 semi-automatic pistol with serial number T12006 for examination. He said he received three fired shell casings and bullet fragments for examination.

Mr. Carman testified that he determined that one of the fired shell casings was fired from the .25 caliber pistol and that one of the fired shell casings was fired from the .38 Colt revolver. He determined that the bullet fragments had the same rifling or class characteristics and the same width and twist as the .25 caliber pistol but that not enough of the characteristics were present to reach a conclusion that the bullet was fired from the .25 caliber pistol. On cross-examination, Mr. Carman stated that he was not asked to determine the distance between the gun muzzle and the victim. On redirect examination, Mr. Carman stated that with regard to the distance between the muzzle and a victim who did not wear clothing, the medical examiner made the relevant conclusions on distance.

Charles "Eddie" Beegle, III, the victim's son, testified that he and the victim lived at 4370 Zelda in Shelby County on August 1, 2008, and that he went to a friend's home that night. He said his father was watching television and cooking dinner when he left. He said that his Grand Am and his father's Tercel and van were parked outside that night. He said he returned home on the morning of August 2 because he received a telephone call from Robert Bowlin, who said he needed to come home immediately. He said that when he returned, the police told him his father was dead. He said that the home looked as though someone had rummaged through it. He said that inside his father's bedroom, clothes were pulled from the closet and lying on the floor.

Mr. Beegle testified that his father used marijuana and had marijuana in the home on August 1, 2008. He said his father kept the marijuana in small, metal tins. He said that when he returned home, the tin on his father's dresser was open and that the money in the top left drawer was missing. He said one of the tins was found in the living room, which looked as though "a few things" were taken from it. He stated the sliding-glass door in the living room had been forced open and had "scuff marks" on it. He denied that the markings were on the door when he left on August 1.

Mr. Beegle testified that he knew the Defendant, that the Defendant's mother, Donna Snipes, and his father had dated for about two years, and that their relationship ended three to six months before his father's death. He said that before his father's death, he last saw the Defendant one year previously. He said the Defendant had been to his home twenty or thirty times. He said the victim gave the Defendant money and grocery items occasionally. He stated that he was told the Defendant was at his home a few nights before his father was

killed. He said that the Defendant did not have permission to be at his home on August 2, 2008, and that his father forbade the Defendant from coming onto their property.

Mr. Beegle testified that the victim slept in little to no clothing and denied that the victim had scrapes, bruises, or bumps on his body. He said that the victim kept a BB gun at the sliding-glass door but that the gun was not there when he returned home. He said that the victim's wallet was also missing. He identified his father's cell phone found inside the truck the Defendant was driving.

Darrell Sebring testified that he had known the victim, his neighbor, for about twenty years. He said he last saw the victim on July 31, 2008, around 6:00 p.m. at the victim's home. He said that while he and the victim stood on the victim's porch, he saw a blue Sports Trak drive down the street. He said he asked the victim if he knew the people inside the car, and the victim denied knowing them. He said that the car drove back down the street and stopped at the victim's driveway, that the Defendant stuck his head out the car window, and that the Defendant asked the victim if he remembered the Defendant. He said the victim responded, "Yeah, I remember you." He said the Defendant also asked the victim if he "had anything." He said that the victim denied having anything and that the Defendant drove away. He denied knowing what they were discussing. He stated that he saw the Defendant at the victim's home before July 31, 2008, and that the Defendant's mother lived with the victim for a couple of months. He admitted the victim used marijuana casually and denied the victim sold marijuana.

On cross-examination, Mr. Sebring testified that the victim shared marijuana with his friends and denied that the victim sold it. He did not recall testifying previously that the victim sold drugs. He admitted he understood the Defendant was referring to marijuana when he asked the victim if he had anything.

Randy Broome testified that at 9:00 a.m. on August 2, 2008, he and his wife were walking their dog when he heard the sound of an aluminum ladder falling and that he heard gunfire a few seconds later. He said that he heard more gunshots, that the second gunshots came from a higher caliber gun, that he heard someone yell for help, and that he called 9-1-1. He said the gunshots came from Zelda Street, behind his house.

On cross-examination, Mr. Broome testified that the first gunshots almost sounded like firecrackers and that about ten to twenty seconds elapsed before the second gunshots, although he said it was possibly thirty to forty-five seconds. He said the person who yelled for help sounded like an older man. He denied seeing anyone who was responsible for the shooting.

Bonnie Maher-Hazel testified that on August 2, 2008, she lived on Zelda Street, that she heard what sounded like firecrackers and gunshots around 9:00 a.m., and that she had her brother call the police. She said that she saw a newer model black or dark blue truck parked facing the wrong direction across the street from her house and that the truck's engine was running. She said she could not see inside the truck. She said the victim's house was a couple of houses down from hers. She said she heard someone cry for help, but she could not determine from where the cry came. She said that after she brought her dog inside, the truck was gone when she returned to the window. She stated that a few minutes later, she saw a white male, that the truck returned, and that she thought the white male got into the truck. She said the male had brown hair and only wore baggy pants with his underwear exposed.

Ms. Maher-Hazel testified that she saw a second white male, who was clean shaven and had lighter hair color, walking with a black rifle behind his back. She said that the truck returned and that the man got into the truck. She said the men walked from the direction of the victim's home. She said she, her brother, and a neighbor walked to the victim's home, called the victim's name, heard no response, and saw the victim lying at the edge of the carport. She said that the victim was not breathing and that she saw a bullet wound below his shoulder blade and a pool of blood at his head. She said she heard four or five gunshots that morning.

On cross-examination, Ms. Maher-Hazel testified that she was inside her home when she heard the first shot. She said the second man she saw walking toward the truck did not have anything in his hands. She said that she was nearsighted, that she wore glasses while driving, that she was not wearing her glasses that morning, and that she was close enough to the first man to see he was carrying a gun. She admitted meeting the victim's former girlfriend but denied meeting her son. On redirect examination, Ms. Maher-Hazel stated that the Defendant's hair color was consistent with one of the men she saw that morning.

Memphis Police Officer Roger Wheeler testified that on August 2, 2008, he was assigned to the crime scene unit, that he saw the victim lying face down in the driveway, and that the victim was shot in the chest. He said a ladder was outside and identified the shell casings found seventy-eight to eighty-four feet from the victim's body. A cigarette butt was found about seventy-two feet from the victim's body. The victim's wallet and two small tin containers were found inside the living room. One of the tins contained small scales. He said a tin containing marijuana "roaches" was found in the victim's bedroom.

On cross-examination, Officer Wheeler testified that the tins contained marijuana in the form of roaches that had been smoked. He denied the tins contained "loose marijuana." On redirect examination, he stated that he dusted the sliding-glass door for fingerprints and that he submitted the fingerprints for testing.

Shelby County Medical Examiner Miguel Laboy testified that he performed the victim's autopsy and that the victim suffered gunshot wounds to the head, left shoulder, and chest. He denied seeing any stippling around any of the wounds and said he concluded the victim was shot from a distance. He said the wound to the head was inflicted by a larger caliber bullet than the wound to the shoulder. He said a toxicology analysis of the victim's blood showed the presence of marijuana. He concluded that the victim died as a result of the gunshot wounds. On cross-examination, Dr. Laboy stated that the scrapes to the victim's body were recent because no scabs had formed over the wounds and that he could not determine if the scrapes were caused by the carport concrete. He said he could not determine if the victim was a chronic marijuana user based on the toxicology report.

Qadriyyah Debnam, an expert in serology and DNA, testified that she worked in the TBI Memphis Crime Laboratory at the time of the victim's death. She analyzed a cigarette butt found at the scene and a buccal swab taken from the Defendant's mouth. She compared the DNA profile she found on the cigarette butt with the Defendant's DNA profile and concluded that the DNA profiles matched. She said the probability of the DNA on the cigarette butt belonging to someone other than the Defendant was less than the world's population.

Memphis Police Officer Richard Morrow testified that he saw the Defendant driving a dark blue Ford Explorer truck on August 2, 2008, at 12:46 p.m., that the Defendant looked at the police, and that he and other officers chased the Defendant, who accelerated to sixty miles per hour in a residential neighborhood. He said that after a lengthy chase, the Defendant jumped out of the truck and ran on foot. He said he caught the Defendant. On cross-examination, Officer Morrow stated that he did not find any weapons on the Defendant, that he saw someone from the backseat point a gun out the window during the chase, and that the gun was inside the truck after the Defendant was caught. He denied searching the truck.

Memphis Police Officer Stacy Milligan testified that she was assigned to the crime scene unit and that she processed the interior of the truck the Defendant was driving. She said she found a loaded semi-automatic handgun under the front passenger seat. A second handgun and a magazine clip were under the driver's seat. The magazine was loaded with five live .380 bullets. She said $475 was found under the driver's side sun visor. A plastic

sandwich bag of marijuana was found inside the console. She said she collected a red Nike t-shirt.

Memphis Police Lieutenant Barry Hanks testified that he investigated the victim's death, that the Defendant, John Smith, and Lujan Jesus became suspects, that the truck they used was identified by a witness, and that the truck was identified in a robbery of another person. He said that other officers interviewed Mr. Jesus and that the police found the .38 caliber revolver as a result of the interview. He said that he took the DNA swab from the Defendant and that he did not notice any injuries to the Defendant. He said he sent the three handguns to the TBI for analysis.

Lieutenant Hanks testified that he found a black Motorola Silver cell phone inside the truck the Defendant was driving and that the phone belonged to the victim. He said that he saw a small blood stain on the Defendant's shorts at the time of his arrest and that he collected them as evidence.

Memphis Police Sergeant James Max testified that he found a ladder near the victim's body and that an overturned five-gallon bucket was behind the ladder. He said the Defendant was not interviewed the day he was arrested because of concerns he was under the influence of an illegal substance. He said that the next day, he interviewed the Defendant, who denied responsibility for the victim's death. The Defendant's statement was received as an exhibit. The Defendant told Sergeant Max that his codefendant shot the victim with a .38 caliber revolver, although he admitted he was armed with a .25 caliber pistol. The Defendant said that the victim was his mother's former boyfriend and that his codefendant was a childhood friend. The Defendant said the .380 caliber pistol was not used and remained in the truck during the shooting. The Defendant said the truck he was driving belonged to Richard Stevens.

The Defendant told Sergeant Max that he thought he and his friends were "going out to get radios" when they arrived at the victim's home. He said he and one of his codefendants went to the back of the victim's home and another codefendant stood at the victim's van as a "lookout." He said that he and one of his codefendants entered the home through the sliding-glass door and that the Defendant took marijuana and about $140 from the victim's wallet before the victim knew they were inside the home. The Defendant said that the victim saw him, that the victim chased him, and that he pointed the .25 caliber pistol at the victim. He denied shooting the victim and said he and his codefendant ran from the house through the sliding-glass door. He said that the victim grabbed him when he reached the deck, that he attempted to get away from the victim, and that he shot the victim three times when the victim would not let go of him. He said the victim screamed, fell to the ground, and grabbed the Defendant's legs. He said that he called for his codefendant, that

his codefendant returned, and that his codefendant shot the victim in the head with the .38 caliber revolver. He said they left the scene in the truck.

The Defendant told Sergeant Max that his codefendant took a pellet gun from the victim's home. He said he intended to take the victim's marijuana and money without harming the victim. He said that before the victim saw him inside the home, the .25 caliber pistol was in his shorts pocket and that he removed the gun from his pocket when the victim came toward him. He said his codefendant held the .38 caliber revolver in his hand when they entered the home. He denied that the person who acted as a lookout was armed with a handgun. He admitted taking one and one-half ounces of marijuana from a wooden box on the footrest in the living room. He said he took a gun inside because he did not know if the victim had a gun.

Memphis Police Sergeant Joseph Stark testified that he interviewed John Michael Smith, the codefendant who entered the home with the Defendant. Mr. Smith first denied involvement in the shooting. Mr. Smith told Sergeant Stark that the Defendant shot the victim and that the Defendant told Mr. Smith that he was scared and killed the victim. Mr. Smith denied carrying a gun during the shooting. Mr. Smith said that he and the Defendant were riding around and smoking marijuana when the Defendant mentioned going to the victim's home. Mr. Smith said that before he entered the home, the victim saw the Defendant and chased him, that the Defendant and the victim struggled, and that he heard gunshots. He said they got into the navy blue Ford truck and drove away. Mr. Smith said that during the shooting, he was in front of a neighbor's home and that the Defendant told him he shot the victim because the victim grabbed his leg and would not let go. He said he heard the victim asking for help after the shooting. He admitted reloading the .25 caliber pistol three times.

Mr. Smith told Sergeant Joseph Stark that the Defendant had the .380 pistol that was found inside the truck, that the Defendant bought the .380 after the shooting, and that the .25 caliber pistol belonged to the Defendant. He denied the Defendant told him where he obtained the truck. Mr. Smith admitted that he and the Defendant entered the victim's home, while Mr. Jesus sat inside the truck and that Mr. Jesus had a .38 caliber revolver. He admitted that the victim chased the Defendant, that the Defendant shot the victim to get away, and that Mr. Smith shot the victim in the head. Mr. Smith said he used Mr. Jesus's .38 caliber revolver to shoot the victim.

On cross-examination, Sergeant Stark testified that it was Sergeant Hanks's decision not to interview the Defendant and Mr. Smith the day of their arrest because Sergeant Hanks believed they were under the influence of drugs. He said he did not perform any tests to determine if they were still under the influence at the time of their interviews. On redirect

examination, he stated that Mr. Smith did not appear intoxicated, that his eyes were not bloodshot, that he was communicating well and answering questions, and that he did not see signs of impairment.

Shelby County Sheriff's Officer Amos Harrison testified that he was assigned to the local jail and that he read inmate mail for security purposes. He said that on October 20, 2008, he reviewed a letter signed by "Mike-Mike, AKA Memphis Mike" that contained information about a murder and "drug dealings." He said the return address contained the Defendant's name and booking number. On cross-examination, Officer Harrison stated that he could not verify who wrote the letter or the facts contained in it.

The letter was addressed to "Jackie," who lived in Florida. In the letter, the Defendant wrote that he was charged with first degree murder because "somebody didn't want to listen with two guns pointed . . . at him." The Defendant wrote that the victim attempted to take the gun from him and that he shot the victim three times in the chest. The Defendant said his "partner" shot the victim in the head. He said he went to the victim's home to "rob him of seven pounds of dro" and $4950 cash, totaling $15,000. The Defendant said he kept $10,000 and his partner kept $5450. He described the police chase and said the police found four guns, three ounces of marijuana, sixty-five Xanax, four ounces of powder cocaine, and two ounces of crack cocaine. He admitted selling the drugs.

Officer Harrison testified that he was not aware of $20,000 or drugs being found inside the truck. He admitted that he did not know if the Defendant exaggerated in the letter to impress a woman. He denied knowing the Defendant and said he did not ask the Defendant if he wrote the letter.

Memphis Police Lieutenant Barry Hanks testified that jail correctional officers intercepted a second letter written by the Defendant to "Amber." In the letter, the Defendant introduced himself and said he was in jail because he and his brother robbed "a dope boy," who pulled a gun on him. The Defendant stated that he shot the victim three times in the chest but that the victim did not die until his brother shot the victim in the head. He admitted it was a robbery "gone bad" and said he was not a bad person, although he led a "thug life." On cross-examination, Lieutenant Hanks stated that the Defendant attempted to have the woman write him back. He denied seeing anyone write the letter and said the letter was returned to the sender by the post office.

Upon this evidence, the Defendant was convicted of first degree felony murder during the commission of an aggravated burglary, second degree murder, unlawful employment of a firearm during the commission of a dangerous felony, and aggravated criminal trespass.

With regard to the aggravated burglary count, the jury found the Defendant guilty of the lesser included aggravated criminal trespass of a habitation. This appeal followed.

The Defendant contends that his convictions for felony murder and for aggravated criminal trespass are mutually exclusive verdicts and that his felony murder conviction must be dismissed. The State responds that the verdicts are consistent and not mutually exclusive. We conclude that the Defendant is not entitled to relief.

The doctrine of mutually exclusive verdicts is invoked when "'a guilty verdict on one count logically excludes a finding of guilty on the other.'" *State v. Chris Jones*, No. W2009-01698-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App. Mar. 9, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011) (quoting *Jackson v. State*, 577 S.E.2d 570, 573 (Ga. 2003)). "'[I]n order to find the defendant guilty on both counts, [the jury] necessarily reached two positive findings that cannot logically mutually exist.'" *Id.* (quoting *Jackson*, 577 S.E.2d at 574 (internal quotations omitted)). The most noted example of mutually exclusive verdicts is a finding of guilt on two counts arising from the same act where one count requires proof of a negligent act and the other count requires evidence of an intentional act. *See Chris Jones*, slip op. at 12; *Jackson*, 577 S.E.2d at 575.

Inconsistent verdicts, though, arise when a defendant is convicted of one offense and acquitted of another offense, although both offenses arose from the same criminal transaction. *See Wiggins v. State*, 498 S.W.2d 92, 94 (Tenn. 1973); *Chris Jones*, slip op. at 12. Our supreme court has explained,

> [c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Wiggins*, 498 S.W.2d at 93-94. Mutually exclusive verdicts "result in two positive findings of acts which cannot logically mutually exist." *Jackson*, 577 S.E.2d at 574 n.3. In comparison, inconsistent verdicts "bespeak a positive finding of fact as to one charge and the failure to make a positive finding of fact as to the other." *Id.*

We conclude that the verdicts are not mutually exclusive. With regard to the felony murder conviction, the State was required to prove beyond a reasonable doubt that the Defendant killed the victim during the perpetration of *or an attempt to perpetrate* an

aggravated burglary. T.C.A. § 39-13-202(a)(2) (2010) (emphasis added). The jury was not required to find that the Defendant killed the victim during a completed aggravated burglary. It had the option of finding that the Defendant killed the victim during an *attempted* aggravated burglary. The Defendant told the police that he shot the victim, that he intended to take marijuana and money from the victim's home without the victim's consent, and that he possessed a gun because he feared the victim had a gun inside the home. *See id.* §§ 39-14-402(a)(1)-(4); 39-14-403 (2010).

The jury chose to convict the Defendant of aggravated criminal trespass, a lesser included offense of aggravated burglary. With regard to the aggravated criminal trespass conviction, the State was required to prove beyond a reasonable doubt that the Defendant entered the victim's property without the victim's consent and that the Defendant intended, knew, or was reckless "about whether such person's presence would cause fear for the safety of another." *See id.* § 39-14-406(a)(1)-(2) (2010). The Defendant entered the victim's home with a gun and with the intent to take money and marijuana. Although the Defendant stated that he did not intend to kill the victim, it was reasonable for the jury to find that the Defendant committed aggravated criminal trespass in an attempt to accomplish an aggravated burglary. It concluded that the Defendant intended, knew, or was reckless about whether his presence inside the victim's home would cause fear for the victim's safety.

Application of the mutually exclusive verdict doctrine applies when the relevant offenses involve different mental states. *See Chris Jones*, slip op. at 12; *Jackson*, 577 S.E.2d at 575. With regard to the felony murder conviction, the State was required to prove the mens rea of the predicate felony. T.C.A. § 39-13-202(b) (2010). In the Defendant's case, the State was required to prove the mens rea of aggravated burglary. Because the burglary statute is silent regarding the required mens rea, the State was required to prove that the Defendant acted with intent, knowledge, or recklessness. *Id.* § 39-11-301(c). Likewise, with regard to the aggravated criminal trespass conviction, the State was required to prove that the Defendant intended, knew, or was reckless about whether his presence inside the victim's home "would cause fear for the safety of another." *Id.* § 39-14-406(a)(2). The verdicts are not mutually exclusive.

With regard to inconsistent verdicts, we conclude that the jury's convicting the Defendant of felony murder and acquitting him of aggravated burglary are inconsistent. This inconsistency, though, does not automatically entitle the Defendant to relief from his felony murder conviction. *See Wiggins*, 498 S.W.2d at 93-94. The proof established that the Defendant entered the victim's home without the victim's consent, that he took marijuana, money, and a cell phone, and that he shot the victim. The money, drugs, and cell phone were found in the truck the Defendant was driving immediately after the shooting. Shell casings found at the crime scene were consistent with being fired from the firearms found in the

truck. Likewise, the Defendant's DNA was found on a used cigarette near the victim's body. We conclude that the evidence is sufficient to support the Defendant's convictions for felony murder during the commission of an aggravated burglary and aggravated criminal trespass. Although the verdicts are "seemingly inconsistent," we will not speculate about the jury's reasoning because the evidence supports findings of guilt with regard to both offenses. *See id.* The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE